# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| REHOBOTH HOSPITALITY, LP d/b/a | ) | Case No. 11-12798 (KG) |
| LOGOS PLAZA HOTEL, | ) | |
| | ) | |
| Debtor. | ) | |

## DECLARATION OF ARASU A. RAJARATNAM IN SUPPORT
## OF FIRST DAY MOTIONS AND APPLICATIONS

Arasu A. Rajaratnam, being duly sworn, deposes and states as follows:

1. I am the Manager of Rehoboth Hospitality GP, LLC, the general partner (the "General Partner") of Rehoboth Hospitality, LP (the "Partnership"), (a) a limited partnership formed under the laws of the State of Delaware and (b) the above-captioned debtor and debtor-in-possession (the "Debtor" or the "Partnership"). In addition to the General Partner, there are two limited partners: Mr. and Mrs. Arasu A. and Emma Rajaratnam, by the entireties, and Dr. Howard Hutt. Their respective ownership interests are as follows: General Partner (2%), the Rajaratnams (48%), and Dr. Hutt (50%).

2. On September 5, 2011 (the "Petition Date"), the Debtor commenced a Chapter 11 bankruptcy case (the "Chapter 11 Case") by filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware.

3. I submit this Declaration in support of the Debtor's Chapter 11 filing and the First Day Pleadings. Any capitalized term not expressly defined herein has the meaning ascribed to it in the applicable First Day Pleading. Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my review of relevant documents, or my

1

opinion based upon my experience and knowledge of the Debtor's operations and financial condition. If I were called upon to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, review of documents, or opinion. I am authorized to submit this Declaration on behalf of the Debtor.

A. **The Partnership Business**

4. The Debtor presently maintains its corporate headquarters in Philadelphia, Pennsylvania. The Debtor owns and operates Logos Plaza Hotel (formerly Howard Johnson) in Abilene, Texas (the "Hotel"). Rehoboth Hospitality, LP was formed in January 2005 and purchased the Hotel property located at 5203 South First Street, Abilene, TX 79605 from Zions First National Bank ("Zions") on February 14, 2005. The Hotel had been obtained by Zions through foreclosure and was not operational when purchased by the Debtor.

5. The Hotel property consists of the main atrium building and four outbuildings (including 30,000 sq. ft of meeting space, a banquet facility, and an onsite restaurant). The Debtor made substantial improvements costing $4 million, including substantial rehabilitation of the banquet facility, 107 guest rooms in the atrium building, the meeting rooms, the kitchen, and common areas, including installation of mechanical systems (electrical, plumbing, and air conditioning), to the Hotel before it opened as Howard Johnson Plaza Hotel in June 2007. The Hotel is the Partnership's sole physical asset.

6. The Hotel's operating results were lower than expected under the Howard Johnson flag. The franchise agreement with Howard Johnson was terminated in 2008, and the Hotel continued operations as an independent. With only 70 of the 107 rooms in the atrium building online, the Debtor continued to experience significant liquidity problems despite various revenue-generating and cost-cutting actions (that prevented it from making certain payments to

creditors). The Debtor's workforce currently consists of eight employees, three of whom are salaried and five of whom are hourly workers.

7. For the year ended December 31, 2010, the Partnership generated revenue of approximately $455,869.91. However, expenses ran approximately $608,958.65, yielding a net operating loss of $153,088.75.

8. In early 2011, the banquet manager departed, leading to a substantial drop in banquet facility revenues. By April 2011, the Debtor faced a liquidity crisis related to scheduled interest payments on the 25-year first mortgage. Based on the first six months of 2011, the Debtor was operating at a net operating loss of $24,451.59. A loan modification discussion and a second discussion regarding curing of the approximate $45,000 default appeared at the time to be the only viable options to ease the liquidity crunch. Although ongoing conversations between Zions and the General Partner were at first encouraging, there came a point when Zions's attitude changed markedly, the cure discussion ended, and Zions scheduled the Hotel for foreclosure.

9. Within the week preceding the scheduled non-judicial foreclosure, Zions sold its first mortgage position to Abilene Holdings, LLC.

B. **Pre-Petition Capital Structure**

10. As of the Petition Date, the outstanding debt on the first mortgage totaled approximately $881,000, inclusive of default interest and late charges, but exclusive of attorneys fees, costs, expenses or other charges. Additionally, although purportedly written off by Zions, there may be an outstanding debt on a second mortgage of approximately $124,000, inclusive of default interest and late charges, but exclusive of attorneys fees, costs, expenses or other charges. The two mortgages (collectively, the "Lender Indebtedness") are secured by liens on and security interests in substantially all of the Debtor's assets.

11. In addition, the Debtor has approximately $487,000 in judgments against it.

12. The Debtor has unsecured debt obligations in the amount of approximately $4.2 million. However, almost none of this is trade debt. Indeed, only approximately $30,000 relates to real estate taxes and approximately $16,000 to utilities. The remainder largely reflects my loans to the Partnership.

13. Finally, equity contributions total approximately $2 million.

C. **Events Leading to Bankruptcy**

14. Debtor opened the Hotel shortly before the United States plunged into a financial crisis. Due to shortage in credit, the Debtor was unable to complete the restoration and rehabilitation of the remaining 100 rooms. Moreover, only half of the 70 available rooms were rented on average per night.

15. By the beginning of 2011, the losses and subsequent negative cash flow generated over the past five years had drained the company of liquidity -- despite the fact that I personally loaned approximately $4 million to the Partnership to keep the Hotel afloat. This figure is in addition to the original $2 million equity contributions made by the limited partners in the approximate amounts of $1 million each. Beginning April 2011, the Debtor was unable to make the mortgage payments. By August 18, 2011, it had fallen behind in its mortgage payments by approximately $45,500.

16. In my opinion, the main problem forcing the Debtor into bankruptcy was that Zions abruptly terminated the loan modification and cure negotiations and had scheduled a non-judicial foreclosure sale of the Hotel for September 6, 2011. Literally days before the foreclosure was scheduled to occur, Zions inexplicably sold the note to Abilene Holdings, LLC.

17. The Debtor commenced this Chapter 11 case after a thorough examination of its various restructuring alternatives. As part of this process, the Debtor has engaged in extensive discussions with its pre-petition secured lender and determined that a strategic partnership will provide the best opportunity to restructure the Debtor's operations.

18. Toward that end, the Debtor has received a letter of intent from a hotel management entity called Emerald Twinkle Star Roofs, Inc. ("Emerald"). Emerald has offered to infuse approximately $200,000 into the business to stabilize and improve Hotel operations. Citing the fact that the Hotel contains the largest banquet space in the Abilene area, Emerald has also expressed its interest in adding the Hotel to its portfolio of assets.

19. The General Partner has also taken note of the fact that Texas is a state that people are moving into and that Abilene is home to approximately 50,000 college students.

20. Accordingly, the Debtor has determined that it is in the best interest of the Debtor, its estate, and its creditors to seek Chapter 11 protection in order, among other things, (i) to stay the pending foreclosure sale and (ii) to restructure the Debtor's operations through the establishment of a strategic partnership.

### D. The First Day Pleadings

21. To enable the Debtor to minimize any adverse effect of the commencement of the Chapter 11 Case on its business, as well as preserve the value of its business to enable it to market and sell the business operations as a going concern or attract a strategic partner, the Debtor is requesting various types of relief in certain "first day" applications and motions (collectively, the "First Day Pleadings"). The First Day Pleadings seek relief, among other things, to: (a) obtain access to cash collateral to fund the operation of the Debtor's businesses; (b) maintain employee confidence and morale; (c) ensure the continuation of the Debtor's cash

management systems and other business operations without interruption; and (d) establish certain other administrative procedures to promote a smooth transition to Chapter 11. Building and maintaining the support of the Debtor's employees, customers, and service providers, as well as maintaining the day-to-day operations of the Debtor's business with minimal disruption will be crucial to the Debtor's efforts to maximize the value of its estate for the benefit of all stakeholders.

      **1.**    **Debtor's Motion for Order Authorizing Debtor to (A) Continue and Maintain Cash Management System and Existing Bank Accounts; (B) Continue Use of Existing Business Forms; and (C) Granting Interim and Final Waiver of Section 345 Requirements.**

22. The Debtor's cash management system consists of two separate bank accounts (the "Bank Accounts") with two different banks, one in Texas (Chase) and one in Pennsylvania (Capital Bank of Maryland). Cash receipts and American Express and Discover Card revenues are deposited into Chase. After water and cable bills are paid, the balance is transferred to Capital Bank of Maryland ("Capital"). Visa and MasterCard revenues are deposited into the Capital accounts as well. Payments of operating debts are made from the Capital account.

23. The Debtor requests a waiver of the requirement that new bank accounts be opened to replace all of the Bank Accounts because such a requirement would unnecessarily disrupt its business and would not provide any significant benefit to the Debtor's estate, its creditors, or other parties in interest. The Debtor's ability to continue and maintain the cash management system and Bank Accounts is important to the efficient administration of the Debtor's estate and is necessary to prevent inordinate disruption to the Debtor's operations.

24. The Debtor also seeks authority to continue to use their current payroll provider (Paychex) and operating checks, existing stationery and business forms (the "Business Forms")

during the pendency of this Chapter 11 Case. The Debtor's ability to use the Business Forms without alteration or change will prevent inordinate and unnecessary disruption and expense and, thus, is in the best interests of the Debtor's estates and creditors. The Debtor also seeks a waiver of the requirement that the legend "debtor-in-possession" be imprinted on any existing Business Forms, including checks, and requests that its banks be permitted to honor pre-petition checks as they are presented consistent with other orders of this Court.

25. In conjunction with the maintenance of the Debtor's cash management system and Bank Accounts, and pursuant to section 345(a) of the Bankruptcy Code, the Debtor seeks approval for a waiver of the investment and bonding requirements of section 345(b) of the Bankruptcy Code, first on an interim basis, and after a final hearing on a final basis. The Debtor seeks this authorization to insure the orderly entry into bankruptcy and to help efficiently administer its business and to avoid the disruptions and distractions that may divert the Debtor's attention from urgent matters during the initial stages of this Chapter 11 Case.

26. The Debtor will continue to maintain Quicken records respecting all transfers among the Bank Accounts so that all transactions can be tracked and monitored after they have occurred. The Debtor will instruct its banks to add the designation "Debtor-in-Possession" or "DIP" to all checks ordered in the future, will treat the Bank Accounts for all purposes as accounts of the Debtor as debtor-in-possession, and will maintain records that recognize the distinction between post-petition and pre-petition activities.

27. For the foregoing reasons, I believe that the request regarding the continuance and maintenance of the cash management system and existing bank accounts, use of existing Business Forms and granting of the waiver of 345 requirements in the cash management motion

is in the best interests of the Debtor's estate and creditors and is both necessary and appropriate to the efficient administration of these cases and the Debtor's reorganization efforts.

> 2. **Motion of the Debtor for Order Pursuant to Sections 105, 361, 362, 363, 364, 1107 and 1108 of the Bankruptcy Code Authorizing Debtor to Maintain Existing Insurance Policies And Pay All <u>Policy Premiums Arising Thereunder or in Connection Therewith.</u>**

28. The Debtor requests, pursuant to sections 105, 361, 362, 363, 364, 1107 and 1108 of the Bankruptcy Code, authorization to maintain existing insurance policies and pay all policy premiums, as well as explore the adequacy of and, possibly, less expensive alternatives to the force-placed insurance obtained by Zions.

29. In the ordinary course of business, the Debtor maintains in current effect certain insurance policies providing coverage for, among other things, fire, theft, and general liability (collectively, the "Insurance Policies"). The Insurance Policies are essential to the preservation of the value of the Debtor's Hotel. The Insurance Policies are required by the Debtor's secured lenders. Further, I understand that the Guidelines of the Office of the United States Trustee for the District of Delaware require debtors to maintain insurance coverage throughout their chapter 11 proceedings.

30. I believe the authority to maintain the existing Insurance Policies and pay all of the premiums or to obtain new, less-costly insurance in accordance with the Debtor's pre-petition business practices is in the best interest of the Debtor and its estates and will enable the Debtor to continue to operate its business in Chapter 11 without disruption.

> 3. **Motion of Debtor Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for an Order (I) Authorizing Payment of Pre-Petition Wages, Compensation, Payroll Taxes, and Employee Benefits and (II) Authorizing Financial Institutions to Honor and Process <u>Checks and Transfers Related To Such Obligations.</u>**

31. The Debtor requests, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code that the Court authorize the Debtor to pay (a) in its sole discretion, (i) all obligations related to wages, (ii) all payroll taxes related to wages and salaries, (iii) expense reimbursements to employees for job related expenses, (iv) employee benefits, and (v) all costs with regard to services provided by its employees during the pre-petition period and (b) maintain and continue to honor its practices, programs, policies and benefit plans for their employees as they were in effect as of the Petition Date, and as such, may be modified, amended, or supplemented from time to time in the ordinary course.

32. As of the Petition Date, the Debtor employed eight individuals -- three salaried employees and five hourly workers. Additionally, there is at least one key vacancy at the Banquet Manager position. The continued operation of the Debtor's business as a going concern pending its reorganization depends largely upon the retention of the services of these employees and the maintenance of employee morale and cooperation. Maintaining going concern value is critical to maximizing the value of the Debtor's Hotel. Consequently, it is critical that the Debtor be authorized to satisfy its employee-related obligations and continue its ordinary course employee plans -- which is limited to Workers' Compensation and vacation/sick leave for salaried employees -- in effect as of the Petition Date.

33. Accordingly, I believe that the authority to pay all employee obligations in accordance with the Debtor's pre-petition business practices is in the best interests of the Debtor and its estate and will enable the Debtor to continue to operate its business in Chapter 11 without disruption. Without the requested relief, the stability of the Debtor will be undermined, perhaps irreparably, by the distinct possibility that otherwise loyal employees will seek other employment alternatives.

4. **Debtor's Motion for Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for Authorization to Pay Certain Pre-Petition Taxes and Fees.**

34. By this Motion, the Debtor seeks entry of an order authorizing the Debtor to pay pre-petition real estate taxes, City and State occupancy taxes, and other tax obligations and local regulatory fees to various state and local taxing authorities, including those taxes and fees subsequently determined upon audit, or otherwise, to be owed for periods prior to the Petition Date, and including any penalties and interest thereon.

35. Pre-petition, on or about August 26, 2011, the Debtor entered into a real estate tax installment payment plan at the rate of $2,000 per month. The first payment is due September 28, 2011. The plan terminates August 28, 2012.

36. Payment of the pre-petition taxes is critical to the Debtor's continued, uninterrupted operations. Nonpayment of these obligations may cause taxing authorities to take precipitous action, including, but not limited to, filing liens, preventing the Debtor from conducting business, seeking to lift the automatic stay, and imposing personal liability on the Debtor's officers and directors, all of which would disrupt the Debtor's day-to-day operations and could potentially impose significant costs on the Debtor's estate.

37. Accordingly, I believe that the authority to pay the taxing authorities in accordance with the Debtor's pre-petition business practices is in the best interest of the Debtor and its estate and will enable the Debtor to continue to operate its business in Chapter 11 without disruption.

5. **Motion of Debtor Pursuant to Sections 105(a) and 366 of the Bankruptcy Code for Order (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, and (II) Deeming Utilities Adequately Assured of Future Payment.**

38. The Debtor seeks entry of an order, pursuant to sections 105(a) and 366 of the Bankruptcy Code, prohibiting its utility companies from discontinuing, altering or refusing service to the Debtor and deeming them adequately assured of future payment.

39. Uninterrupted utility services are essential to the Debtor's ongoing operations and, therefore, to the success of the Debtor's efforts to reorganize its business as a going concern. The Debtor utilizes the services of approximately five utilities in the operation of its Hotel. If one or more of the utilities refused to provide or discontinued services even for a brief period, the Debtor's operations would be severely disrupted.

40. The Debtor intends to pay all post-petition obligations owed to the utility companies in a timely manner. As adequate assurance of the future performance, the Debtor proposes to provide a deposit within 30 days of the Petition Date to each utility, other than the electricity company (which has agreed to maintain the current payment arrangement), excluding de minimis providers, equal to the cost of one-half month of such utility's average monthly service, if necessary, calculated as a historical average over the past twelve months; except where a utility is paid in advance for its services or is satisfied that it is already adequately assured of future performance.

    6. **Debtor's Motion Pursuant to Sections 361, 362, 363 and 507 of the Bankruptcy Code and Bankruptcy Rule 4001 for an Order: (1) Authorizing Use of Cash Collateral; (2) Granting Adequate Protection Liens and Administrative Claims; (3) Scheduling and Approving the Form and Method of Notice for a Subsequent Hearing; and (4) Granting Related Relief.**

41. The Debtor requests authority to use cash collateral pursuant to section 361(2) of the Bankruptcy Code and authority to grant the Debtor's pre-petition secured lenders adequate protection; and the scheduling of a final hearing on the motion.

42. Without conceding the point, the Debtor anticipates Abilene and Zions will assert that substantially all of the cash generated by the Debtor's Hotel operations constitutes cash collateral in connection with the Lender Indebtedness. The Debtor has requested that the Court authorize its use of cash collateral in the amount of and for the purposes set forth in the budget, to be presented at the First Day Hearing, which may be amended, supplemented, or extended.

43. To the extent that the Debtor's cash is cash collateral in connection with the Lender Indebtedness, the Debtor has an immediate need to obtain use of the cash collateral for, among other things, the continuation of its business operations, the preservation and orderly disposition of its business as a going concern, and the orderly administration of its estate. Without the use of cash collateral, the Debtor will be unable to pay necessary expenses. The ability of the Debtor to obtain liquidity through the use of the cash collateral is vital to the Debtor's effort to maximize the value of its Hotel business. Without this relief, the Debtor will be forced to shut down immediately, causing immediate and irreparable harm.

44. I believe the Hotel is worth at least $1.5 million and that a sufficient equity cushion exists to adequately assure future payment of the Lender Indebtedness.

45. Because the Debtor would have no alternative other than to shut down immediately without the authority to use cash collateral, I believe that granting the Debtor authority to use cash collateral is in the best interest of the Debtor, its estate, and its creditors.

## Conclusion

46.     Based on the foregoing, I believe the approval of First Day Orders are in the best interests of all stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 8, 2011

_____
Arasu A. Rajaratnam
Manager of Rehoboth Hospitality GP, LLC;
General Partner of the Debtor